U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUL 1 7 2007

ROBERT A. SHEMWELL, CLERK
BY _____
            DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

DAVEON MCCULLOUGH,                 CIVIL ACTION
            Petitioner              NO. CV05-0674-A

VERSUS

WARDEN BURL CAIN,                  JUDGE DEE D. DRELL
            Respondent             MAGISTRATE JUDGE JAMES D. KIRK


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by petitioner Daveon McCullough on April 15, 2005. McCullough is contesting his 1999 conviction and sentence in the Louisiana Ninth Judicial District Court on one count of second degree murder. McCullough raises the following issues for habeas review:

> 1. The State of Louisiana withheld favorable evidence in violation of Brady v. Maryland,[1] (three blood stained towels found at the crime scene). DNA comparisons showed the blood was not McCullough's blood.

> 2. The trial judge violated McCullough's right to due process of law when he allowed the prosecutor to call a witness, one of McCullough's co-defendants, to testify pursuant to a plea agreement. The trial judge did not allow McCullough to call seven other witnesses, also co-defendants, who told the detectives that McCullough did not participate in the crime.

> 3. McCullough had ineffective assistance of counsel at trial because his attorney allowed the use of perjured

---

[1] Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1207 (1963)

testimony and failed to object to the withholding of
favorable evidence by the prosecution.

McCullough claims and the Respondent admits exhaustion of
McCullough's state court remedies (Doc. Items 1, 36).  McCullough's
habeas petition is now before the court for disposition.

<u>Facts</u>

The facts of this case as set forth by the Louisiana Third
Circuit Court of Appeal in <u>State v. McCullough</u>, 2000-983 (La. App.
3d Cir. 12/6/00), 774 So.2d 1105, writ den., 2001-0533 (La.
1/25/02), 806 So.2d 669, are as follows:

"The victim's body was discovered by her sister-in-law,
Leta Juneau, Ms. Juneau's daughter, Sharon Yarbrough, and
Ms. Yarbrough's son, along with a police officer who had
been called to the victim's residence on October 24, 1994.

"Doctor George McCormick II, a forensic pathologist and
the coroner in Caddo Parish, was accepted as an expert in
the field of forensic pathology. He concluded that
several stab wounds to the victim's neck and chest areas
were fatal.

"Palm prints found on rubber gloves recovered from a
garbage can in the victim's kitchen were linked to
Fredrick Gradley. Impressions on the floor also
corresponded in design and size to Gradley's sneakers.

"Detective Gary Billingsley, who was working in the
detective division of the Alexandria Police Department on
October 24, 1994, testified that on December 9, 1994, he
interviewed Fredrick Gradley. After getting a statement
from him, he obtained warrants for first degree murder
for Jerry Joseph, Joseph General, Joseph Green and Cedric
Howard. On June 22, 1995, he spoke to Jerry Joseph and
Mr. Joseph identified several persons from a lineup.
After Mr. Joseph made the identifications, arrest
warrants were secured for the Defendant, Fredrick Bush,
Lonnie Simmons, Jr., and Joseph Michael Elie III.
Detective Billingsley testified on cross-examination that
the Defendant's footprints did not match the footprints
found at the crime scene. He further testified that

Fredrick Gradley admitted he went in the kitchen and got the knives and he said that Jerry Joseph put the victim in the closet. Initially, Jerry Joseph denied involvement in the murder, but on June 22, 1995, he admitted his involvement. He implicated the five individuals that Fredrick Gradley had referred to and four more, including the Defendant. According to Detective Billingsley, Jerry Joseph, Joseph General, Cedric Howard and Joseph Green had all either pled guilty or been convicted of the crime at the time of the Defendant's trial, but none of them other than Jerry Joseph named the Defendant. According to Detective Billingsley, none of the individuals other than Jerry Joseph told him that gloves were used, that they had cleaned up after the offense, that they had split up money or that they went to school afterwards. Jerry Joseph provided nicknames of the people involved and Detective Billingsley and others had to go through nickname files to figure out who they were. Joseph named a person, but they could not understand if he was saying David or Daveon. When asked why they put the Defendant's picture in the lineup, Detective Billingsley explained that they realized the Defendant was a half brother to Fredrick Bush and Joseph had named Fredrick.

"Jerry Joseph testified that at the time of trial, he was incarcerated for the murder of the victim. He said he was arrested on a charge of first degree murder but pled guilty to manslaughter. According to Mr. Joseph, he entered a plea agreement with the State. In 1994, Mr. Joseph was twenty-three and selling crack cocaine for a living. Prior to the plea he entered on the manslaughter charge, he had never pled guilty or been convicted of anything.

"Joseph testified he heard about the murder from Fred Gradley and Ced Howard. According to Jerry Joseph, Gradley, Howard, Green, Joe General, Mike Elie, Lonnie Simmons, Fred Bush and the Defendant went to his house. The group then went to a club (Eat-A-Bite) about two to three blocks from Joseph's house. Joseph and Joe General went in the club and got some beer and after they came out, they heard a conversation about a woman on Kelly Street who had a lot of money. According to Mr. Joseph, they said they were 'scoping her out, like watching her house, stealing... .' Shortly thereafter, Joseph testified that they were talking about robbing the lady. According to Joseph, he was just listening to this conversation and they were not talking to him. He later explained that 'they' were Ced Howard and Fred Gradley.

3

After this, he drank some beer and smoked some marijuana.

"According to Mr. Joseph, he did not mind robbing drug dealers, but he was not interested in robbing the old woman on Kelly Street because she did not have anything he wanted. He then stated, 'See, I was robbing her for dope, because that was money. I'm talking about money.'

"Mr. Joseph testified that everyone left after Ced Howard hollered, 'Let's go to Kelly Street, back on Kelly Street.' The only two left there were Mr. Joseph and Joe General. General told Joseph that 'it was going down in the morning.' According to Mr. Joseph, he then consumed two 40 ounce beers and got a bicycle and rode by General's house, but he was not there. Mr. Joseph proceeded to ride the bicycle past Bolton High School and down Chester Street. At some point, when looking for someone to sell drugs to, he asked someone what time it was and they told him it was about 5:00 or 6:00. Joseph confirmed that this was in the early morning hours. Mr. Joseph then saw Joe General and Fred Gradley talking by a brick church on Chester Street. Ced Howard came around the corner and a couple of minutes later, Joe Green arrived. Joe General said something about the woman on Kelly Street and everyone started hollering, 'let's go by Jay Lowe.' Jerry Joseph explained that this is Lonnie Simmons and he was supposed to live by the woman on Kelly Street. Jerry Joseph, Joe Green, Fred Gradley, Ced Howard and Joe General were the only ones there at first and they were waiting for Lonnie to come out. Mike Elie arrived followed by Fred Bush and the Defendant. According to Mr. Joseph, there were more people present than the ones he named.

"Mr. Joseph testified that he went to the corner and when he returned everyone was on the side of the house, laughing. He went back across the street and when he returned he saw Ced on the side of the house with a screwdriver and Lonnie 'had the card.' Mr. Joseph testified that he went back and sat on the porch across the street and he saw Ced Howard, Fred Gradley, Joe Green, Joe General and Mike Elie come around in the front. He said it appeared they were 'messing with the door' and they entered the house through the front door. Mr. Joseph then went on the side of the house and the back door was open. Lonnie Simmons was standing there and they heard rumbling in the house, like someone fell. Mr. Joseph entered the house and saw Joe General hitting a

4

woman in the head with his fist. The woman was holding onto Fred Gradley's T-shirt and Ced hit her with a pipe and she fell. Ced Howard told Joe Green he'd 'better get some more of this' and Joe Green ran and kicked her. Mike Elie had already kicked the victim when she was on the floor and the Defendant jumped in and picked her up. When the Defendant was picking her up, Lonnie Simmons walked over and punched her. Fred then came up with a knife and 'when the knife went up' the victim fell. Joe then got the Defendant a little towel because he said his hand was bleeding. According to Mr. Joseph, Joe General, Mike Elie and the Defendant had gloves on that looked like 'doctor gloves.'

"Mr. Joseph testified that when they were leaving, he saw the Defendant take a stick and knock some things off the dresser. Joe General was 'wiping on the side, like the wall, wherever they touched at.'

"William Wansley, who at the time of trial was incarcerated for his conviction on one count of forgery and one count of unauthorized use of an access card, testified that he had been previously convicted for other offenses in this state and in other states. In April of 1998, he was housed in the Rapides Parish Detention Facility for a week. At one point, he shared a cell with the Defendant. Mr. Wansley testified that the Defendant asked him if it was possible that he would get a separate trial from the other defendants. Mr. Wansley testified that the Defendant told him that he felt he could 'beat the charge' if he had a separate trial because during the commission of the crime, he cut his hand on a knife and there was a cloth found in the trash, but when it was examined, the DNA did not match him. The Defendant told Mr. Wansley that the crime was a gang initiation where everyone took turns stabbing and beating an old lady believed to have money. The Defendant further informed Mr. Wansley that they threw some of the knives in the river and that they put a small dog in the closet 'when they did it.' According to Mr. Wansley, this was the first time he had heard about this particular incident and he was not promised help with his charge. Further, he testified that he did not feel threatened, but there could be repercussions in the facility where he was housed because there were a lot of people who knew about 'it' and there were gangs and violent people there. The Defendant pointed out his brother to Mr. Wansley one day in a holding cell and told him that his brother was also

involved. According to Mr. Wansley, the Defendant never did anything to make him dislike him.-
"On cross-examination, the Defense questioned Mr. Wansley about his criminal history and the offenses listed on his rap sheet. Although Wansley denied committing some of the crimes listed, he admitted to numerous convictions including, but not limited to theft by receiving stolen goods, grand theft auto, forgery and possession of marijuana. Defense counsel also questioned Wansley about his reasons for telling the District Attorney about the information prisoners have provided to him.

"Mr. Wansley explained:

"A. Uh, the seriousness of the crime, for one. Also, uh, uh, it-it weighed heavily on my conscious, uh, I have a Christian upbringing, and I don't condone murder. Although I may have, uh, broken the law at times, uh, I'm-I'm not-not guilty of any kind of violence or violent crime. And I don't condone murder, and I don't believe, uh, that what was done was right. And, uh, although I may have been, as you say, dishonest at times, I wouldn't lie about a murder. That's, uh, a very serious thing.

"The Defendant testified that he was seventeen in 1994 and twenty-two at the time of trial. He testified he is from California, having lived there for nine years. He then moved to New Mexico and on to Alexandria, Louisiana. He has also lived in Natchitoches, Louisiana. According to the Defendant, he has not discussed this case with any of the inmates in the jail because his lawyers told him not to. The Defendant testified that he knows Jerry Joseph from the streets since September of 1994 and 'also in here.' He maintained that he is not friends with Jerry and did not run with Jerry because he did not associate with Jerry's crowd and Jerry was older than him. The Defendant said he never had problems with Jerry out on the street, but in 1995, they had a fist fight in jail because Jerry said that four guys said that the Defendant and his half brother were spreading rumors about him. The Defendant testified that he does not know Fred Gradley, and he does not know where the Eat-A-Bite is but knows it is somewhere in the Sonya Quarters. The Defendant calls Fred Bush his half-brother because Bush and the Defendant's baby sister have the same father. He and Bush are friends. The Defendant testified that he was at Ms. Willie Mae Hayward's house on Jeannette Street (which is six or seven blocks from Kelly Street) on the nights of

6

October 23 and 24, 1994. The Defendant explained that he and Ms. Hayward's daughters are good friends and they stayed up watching television from the night of October 23 until about 2:00 a.m. on October 24th. The Defendant testified that he slept on the couch in the living room and he woke up about 8:30 on the morning of the 24th. He left the house at approximately 12:00, went to his half brother's house and then to his house in Karst Park. The Defendant said he first heard of the murder on the news on the day it happened.

"The Defendant testified that William Wansley was in the cell block with him for approximately five days. He explained that the cells are open during the day and closed at night and everybody has access into other people's sleeping cells. The Defendant said that he had two duplicate statements of Jerry Joseph's testimony in his sleeping quarters. According to the Defendant, Wansley shared the same sleeping quarters with him for one night. The Defendant testified that he went to church on Sunday and Jerry Joseph's statements were sitting on the shelf.

"On cross-examination, the Defendant denied ever having been to Kelly Street, but he said he knows where it is. The Defendant denied belonging to a gang and explained the Cripp insignia on his left forearm as follows:

"Q. It says Cripp?

"A. Yeah.

"Q. What's that?

"A. Uh, that was just something that when I was in California that me and my friends who went to school together. You know what I'm saying? That's what we called ourselves.

"Q. Is that a gang?

"A. No, sir, it wasn't no gang. It was just like-just like, you know, how like you got country clubs that you belongs to or whatever. You know, we just all get together, we might do our homework together, we might go out to a basketball game the school might have or a football game, or whatever.

"Q. Go down to the drugstore and have sodas together?

"A. Yeah.

"The Defendant testified that he also had his mother's name tattooed on his other forearm and 'Thug' tattooed on the left side of his chest. He explained that this is 'just a name that everybody together, you know, might use because you might be poor, you ain't rich, or you ain't in between. You're just come from, like, a poor family.' The Defendant also stated that he has an 'R,' an 'S' and a 'C' tattooed on him which stands for 'Rolling Sixties Cripps.' Later in the Defendant's testimony, he testified that he has tattoos on his hands that 'stands for, uh, neighborhood and i got a six and an oh right there.' He affirmed that this stood for the Rolling Sixties.

"The Defendant explained that he met Jerry Joseph in September of 1994 through his sister; Jerry Joseph's cousin and the Defendant's sister were dating. The Defendant acknowledged that he has known Freddie Bush (who he calls his half-brother) since July of 1994, when the Defendant moved to Alexandria. The Defendant denied knowing Joe General. According to the Defendant, the only statements he had read in connection with the case were made by Jerry Joseph. He testified that he and Fred Bush were in the cell together in early 1996 for approximately one week, but they never discussed the case because the Defendant was told by his lawyers not to discuss it with anybody.

"The Defendant affirmed that he had scars on the back of his hand, but he explained that this occurred when he was punching at his girlfriend and he hit a window. He did not go to a hospital for treatment because the cuts were not deep enough for stitches."

## Rule 8(a) Resolution

This court is able to resolve the merits of this habeas corpus petition without the necessity of an evidentiary hearing because there is no genuine issue of material fact that is relevant to the petitioner's claims, and the State court records provide the required and adequate factual basis necessary to the resolution of

the habeas corpus petition.  <u>Moya v. Estelle</u>, 696 F.2d 329, 332-33 (5th Cir. 1983); <u>Easter v. Estelle</u>, 609 F.2d 756, 761 (5th Cir. 1980); Habeas Corpus Rule 8(a).

Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall be considered only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).

Under 28 U.S.C. § 2254 and AEDPA, which is applicable to habeas petitions filed after its effective date on April 24, 1996, habeas relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an *unreasonable determination* of the facts in light of the evidence presented in the State Court proceeding.  Therefore, pure questions of law and mixed questions of law and fact are reviewed under Section 2254(d)(1), and questions of fact are reviewed under Section 2254(d)(2).  <u>Martin v. Cain</u>, 246 F.3d 471, 475-76 (5th Cir.), cert. den., 534 U.S. 885, 122 S.Ct. 194 (2001), and cases cited therein.

9

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent.   A state court decision falls within the "unreasonable application" clause when it unreasonably applies Supreme Court precedent to the facts.   Martin, 246 F.3d at 476, and cases cited therein.   A federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively reasonable.   A federal court cannot grant habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously; the court must conclude that such application was also unreasonable.   Martin, 246 F.3d at 476, and cases cited therein.

Direct review is the principal avenue for challenging a conviction.   The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.   Federal courts are not forums in which to relitigate state trials.   In keeping with this distinction, the writ of habeas corpus has historically been regarded as an extraordinary remedy, a "bulwark" against convictions that violate fundamental fairness.   Therefore, an error that may justify

reversal on direct appeal will not necessarily support a collateral attack on a final judgment.

There are two types of constitutional errors - (1) a trial error which occurs during the presentation of the case to the judge or jury and which is amenable to harmless-error analysis because it may be quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial, and (2) a structural defect in the constitutional of the trial mechanism, which defies analysis by harmless error standards and requires automatic reversal of the conviction because it infects the entire trial process. Brecht v. Abrahamson, 507 U.S. 619, 630, 113 S.Ct. 1710, 1717 (1993). Structural defects affect the framework within which the trial proceeds, rather than simply an error in the trial process itself. Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265 (1991). Examples of structural defects not subject to a harmless error analysis are the total deprivation of the right to counsel at trial, a judge who is not impartial, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation at trial, and denial of the right to a public trial.[2] Arizona v.

---

[2] The Supreme Court in Brecht also noted that, in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict. Brecht, 507 U.S. at 638 n. 9, 113 S.Ct. at 1722 n. 9.

Fulminante, 499 U.S. at 309-310, 111 S.Ct. at 1265, and cases cited therein.  Examples of trial errors subject to the harmless-error analysis are the admission of an involuntary confession or statement, erroneous jury instructions, denial of defendant's right to be present at trial, improper comment on defendant's silence at trial, erroneous admission of evidence, and denial of counsel at a preliminary hearing.  Arizona v. Fulminante, 499 U.S. at 307, 111 S.Ct. at 1263.  The State bears the burden of proving that an error was harmless.  Brecht, 507 U.S. at 629, 111 S.Ct. at 1717.

A federal court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in Brecht, 507 U.S. at 638, 113 S.Ct. at 1722, regardless of whether the state appellate courts recognized the error and reviewed it for harmlessness.  Fry v. Pliler, 127 S.Ct. 2321, 2328 (U.S. June 11, 2007)(holding the "substantial and injurious effect" standard, rather than the "harmless beyond a reasonable doubt" standard, is the standard applicable for assessing the impact of a trial-type constitutional error in a Section 2254 habeas proceeding).  The federal court should treat the constitutional error as if it affected the verdict, and the State bears the burden of persuasion as to the harmlessness of the error.  Fry, 127 S.Ct. at 2328.

It is well settled that the fact that constitutional error occurred in the proceedings that led to a state-court conviction

may not alone be sufficient reason for concluding that a prisoner is entitled to the remedy of habeas.  On the other hand, errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ. Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1503 (2000), and cases cited therein.  If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody violates the Constitution, that independent judgement should prevail.  Williams, 529 U.S. at 389, 120 S.Ct. at 1511.

## Law and Analysis

### Ground No. 1 - Brady Violation

McCullough contends the State withheld favorable evidence in violation of Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1207 (1963).  McCullough contends the State had three blood stained towels, found abandoned at the crime scene, as to which DNA tests showed the blood was not McCullough's blood.  McCullough alleges the State withheld this exculpatory evidence.

In Brady v. Maryland, the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.  Wilson v. Whitley, 28 F.3d 433, 434

(5th Cir. 1994), cert. den., 513 U.S. 1091, 115 S.Ct. 754 (1995), citing U.S. v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).   In order to establish that evidence falls within the purview of Brady, a petitioner must establish that the evidence was (1) suppressed, (2) favorable, and (3) material. Williams v. Whitley, 940 F.2d 132, 133 (5th Cir. 1991).   The prosecutor is not required to deliver his entire file, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.   Wilson, 28 F.3d at 435.

Therefore, McCullough's burden of proof is to show the state suppressed the evidence (either intentionally or inadvertently) and that he was prejudiced thereby.   At trial, the State stipulated that none of the blood found at the scene of the crime was matched to McCullough (Tr. pp. 1220-1221).   However, contrary to McCullough's contention, the lab report stated the amount of DNA present on the washcloth, towel and dish towel was insufficient for further typing (Doc. Item 1, Ex.).[3]   Therefore, there was no DNA evidence from the towels and no exculpatory evidence for the State

---

[3] McCullough circled the part of the lab report which analyzed the hairs found at the crime scene; it was determined that the hairs did not originate from McCullough, Simmons, Bush, Elie, or Gradley (Doc. Item 1, Ex.).   At trial, Officer Ronald Beeson of the Alexandria Police Department, Crime Scene Division, testified that the tests showed all of the hairs submitted to the North Louisiana Criminalistics Laboratory were from the victim (Tr. p. 1236).   This evidence, though not actually exculpatory, was introduced at trial.

14

to disclose to McCullough pursuant to <u>Brady</u>.

Since McCullough has not carried his burden of a <u>Brady</u> violation, this ground for relief is meritless.

<u>Ground No. 2 - Trial Testimony</u>

Next, McCullough contends the trial judge violated his right to due process of law when he allowed the prosecutor to call a witness, co-defendant Jerry Joseph, to testify pursuant to a plea agreement, but did not allow McCullough to call his other co-defendants as witnesses or introduce their police statements or confessions.

Mere violation of evidentiary rules by the state trial court does not in itself invoke habeas corpus relief. <u>Panzavecchia v. Wainwright</u>, 658 F.2d 337, 340 (5th Cir. 1981). Thus, claims challenging the exclusion or inclusion of evidence based on state law do not afford a basis for federal habeas corpus relief. Federal habeas corpus review is limited to errors of constitutional dimension, and federal courts do not sit to review the mere admissibility of evidence under state law. In reviewing state court evidentiary rulings, the federal habeas court's role is limited to determining whether a trial judge's error is so extreme that it constituted a denial of fundamental fairness under the Due Process Clause. <u>Castillo v. Johnson</u>, 141 F.3d 218, 222 (5th Cir.), cert. denied, 524 U.S. 979, 119 S.Ct. 28 (1998), and cases cited

therein.

1.

McCullough filed a motion to suppress Jerry Joseph's testimony pursuant to the Louisiana Public Bribery Statute, La. R.S. 14:118(A)(1)(d) and U.S. v. Singleton,[4] 144 F.3d 1343 (10th Cir. 1998), vac'd on rehearing, 165 F.3d 1297 (10th Cir.), cert. den., 527 U.S. 1024, 119 S.Ct. 2371 (1999).  Pursuant to a plea agreement Joseph agreed to testify against his co-defendants in exchange for use immunity, a guilty plea to a reduced charge of manslaughter (instead of first degree murder), and a commitment from the prosecutors to not oppose his early release on parole. McCullough's motion was first denied, then granted after a hearing pursuant to the original decision in Singleton, but reversed on rehearing because the original opinion in Singleton had been also vacated and reversed (Tr. p. 852).

The trial judge correctly denied McCullough's motion to suppress Joseph's testimony.  It is long established practice for

---

[4] In the 1998 opinion in U.S. v. Singleton, the Tenth Circuit held, where a coconspirator had entered into a plea agreement with the government, that the prosecution violated 18 U.S.C. §201(c)(2), the "anti-gratuity statute," and the Kansas Rule of Professional Conduct 3.4(b), which prohibits offering unlawful inducements to a witness by offering something of value (leniency) in return for a coconspirator's testimony.  In the 1999 opinion, the Tenth Circuit vacated it's earlier ruling and held that Section 201(c)(2) did not apply to the government, so government prosecutors have the discretion to offer leniency in exchange for testimony.

16

the government to call a witness who is an accessory to the crime for which the defendant is charged and have that witness testify under a plea bargain that promises him a reduced sentence. Such a witness may testify so long as the government's bargain with him is fully ventilated so that the jury can evaluate his credibility. U.S. v. Cervantes-Pacheco, 826 F.2d 310, 315 (5th Cir. 1987), cert. den., 484 U.S. 1026, 108 S.Ct. 749 (1988). Adequate rules are in place to protect against abuses. The government of course must not deliberately use perjured testimony or encourage the use of perjured testimony. Cervantes-Pacheco, 826 F.2d at 315, citing Napue v. Illinois, 360 U.S. 264, 269-70, 79 S.Ct. 1173, 1177-78 (1959). The government must also make a complete and timely disclosure to the accused of the fee arrangement it has made with the informant in accordance with Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196 (1963). Cervantes-Pacheco, 826 F.2d at 316, citing U.S. v. Bagley, 473 U.S. 667, 675-84, 105 S.Ct. 3375, 3380-85 (1985). The accused must have an adequate opportunity to cross-examine the informant and government agents about any agreement to compensate the witness. Cervantes-Pacheco, 826 F.2d at 316, citing Bagley, 473 U.S. at 677, 105 S.Ct. at 3381. Finally, the trial court should give a careful instruction to the jury pointing out the suspect credibility of a fact witness who has been compensated for his testimony. Cervantes-Pacheco, 826 F.2d at 316, citing U.S. v. Beard, 761 F.2d 1477, 1481 (11th Cir.), cert.

den., 474 U.S. 907, 106 S.Ct. 239 (1985).   See also, <u>U.S. v.
Barnett</u>, 197 F.3d 138 (5th Cir. 1999), cert. den., 529 U.S. 1111,
120 S.Ct. 1966 (2000); <u>State v. Crosby</u>, 1998-0372 (La. App. 4th Cir.
11/17/99), 748 So.2d 502, writ den., 1999-3555 (La. 1/28/00), 753
So.2d 833.

In the case at bar, Joseph's plea agreement was disclosed to
the jury (Tr. pp. 1352-1354), so the jury was able to evaluate the
credibility of his testimony and, contrary to McCullough's
assertion, Wansley did not testify pursuant to a plea agreement.
The use of Joseph's testimony does not rise to a due process
violation or show the substantial denial of any other
constitutional right.   Therefore, McCullough's counsel's
performance cannot in any way be considered ineffective in this
regard.  Although McCullough alleges the State knew or should have
known Joseph's testimony was perjured, McCullough has not offered
any evidence to show this is true.   McCullough only points out
inconsistencies and weaknesses in Joseph's and Wansley's testimony
(evidence the jury was able to hear and weigh) which do not prove
perjury was committed.

Therefore, this ground for relief is meritless.

2.

McCullough also argues the trial judge erred in denying his
motion to introduce the statements made to the police by Frederick

18

Gradley, Cedric Howard, and Frederick Bush on the ground that the State would not be able to confront and cross-examine them (Tr. pp. 1503-1505).  In a proffer at trial, McCullough called each of the declarants to testify on his behalf and each of them invoked their Fifth Amendment right against self-incrimination.  McCullough thus attempted to show that each of the declarants was unavailable to testify as a witness, as set forth in La. Code Evid. art. 804, Hearsay exceptions, declarant unavailable.[5]

(a) Fifth Amendment Privilege

The Fifth Amendment provides that no person shall be compelled in any criminal case to be a witness against himself.    This

---

[5] La.C.E. art. 804 states in pertinent part:
A. Definition of unavailability.  Except as otherwise provided by this Code, a declarant is "unavailable as a witness" when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court.  This includes situations in which the declarant:
(1) Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement;...
B. Hearsay exceptions.  The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:...
(3) Statement against interest.  A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.  A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

privilege not only extends to answers that would in themselves support a conviction, but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant.  The trial judge is required to determine whether the witness has correctly asserted the privilege, and to order the witness to answer questions if the witness is mistaken about the danger of incrimination.  It need only be evident from the implication of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.  The privilege's protection extends only to witnesses who have reasonable cause to apprehend danger from a direct answer. Ohio v. Reiner, 532 U.S. 17, 19-21, 121 S.Ct. 1252, 1253-1254 (2001), citing Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814 (1951).  The privilege is available to those who claim innocence as well as wrongdoers.  Ohio v. Reiner, 532 U.S. at 21, 121 S.Ct. at 1254, citing Grunewald v. United States, 353 U.S. 391, 421-22, 77 S.Ct. 963 (1957).  A witness who is unavailable because he has invoked the Fifth Amendment privilege against self-incrimination is unavailable under the terms of Rule 804(a)(1) of the Federal Rules of Evidence. U.S. v. Young Bros., Inc., 728 F.2d 682, 690 (5th Cir. 1984), cert. den., 469 U.S. 881, 105 S.Ct. 246 (1984); State v. Short, 2007 WL 1461866, *3 (La. App. 3d Cir. 5/16/07), __So.2d __ (La.C.E. art. 804).

In the case at bar, no attempt was made by the state courts to determine whether McCullough's proffered witnesses had correctly asserted their Fifth Amendment privilege against self-incrimination.  McCullough proffered their testimony asserting their Fifth Amendment privilege in an attempt to show the witnesses were technically unavailable, after the trial judge denied his motion to introduce their written statements.  The trial judge did not consider the proffer and excluded the statements on the ground that the State would be denied it's right to confront and cross-examine the witnesses, which McCullough argues were crucial to his defense of innocence because they rebutted the State's evidence from Joseph and Wansley and supported his claim of innocence.  Had the trial judge determined the privilege was not properly invoked by the proffered witnesses, he could have ordered them to answer counsel's questions, obviating the need to introduce the statements in lieu of testimony.  If they nevertheless refused, they might have been "unavailable" under La.C.E. article 804(A)(2) and the statements might be admissible at trial under Article 804(B).

If, on the other hand, the trial judge had determined that the witnesses were entitled to invoke their Fifth Amendment privilege against self-incrimination, the witnesses would have been "unavailable" within the meaning of Article 804(A)(1).  U.S. v. Young Bros., Inc., 728 F.2d 682, 690 (5th Cir.), cert. den., 469 U.S. 881, 105 S.Ct. 246 (1984).  Under Louisiana law, a declarant

is "unavailable as a witness" when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. State ex rel. C.P., 2002-1515 (La. App. 4th Cir. 5/28/2003), 848 So.2d 725. Once the trial judge determined that the witnesses were unavailable, he should have proceeded to consider the admissibility of the statements under Article 804(B) and, also, the reliability and trustworthiness of the out-of-court statements. The Louisiana Supreme Court held in State v. Gremillion, 542 So.2d 1074 (La. 1989), that even if a hearsay statement does not meet any applicable exception to the hearsay rule (such as those set forth in Article 804(B)) and thus would normally be inadmissible, may be admitted if (1) it is reliable, trustworthy and relevant, and (2) if to exclude it would compromise the defendant's fundamental right to present a defense. The court in Gremillion relied on Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038 (1973), noting that the catchall hearsay exception in La.C.E. art. 804(B)(6)[6] applies to criminal cases through the right

_____

[6] La. Rules of Evidence article 804(B)(6), "Other exceptions," states,

"In a civil case [or in a criminal case, see above], a statement not specifically covered by any of the foregoing exceptions if the court determines that considering all pertinent circumstances in the particular case the statement is trustworthy, and the proponent of the evidence has adduced or made a reasonable effort to adduce all other admissible evidence to establish the fact to which the proffered statement relates and the proponent of the statement makes known in writing to the adverse party and to the court his intention to offer the statement and the

of compulsory process when an accused in a criminal case offers reliable trustworthy evidence not fitting within the contours of a legislatively recognized exception fo the hearsay rule.  See also, State v. Vigee, 518 So.2d 501 (La. 1988).

(b) Right to Present a Defense

Few rights are more fundamental than that of an accused to present witnesses in his own defense. Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038 (1973).  In Chambers, the Supreme Court held that a combination of erroneous evidentiary rulings which excluded hearsay testimony as to a confession to the crime by a third party, rose to the level of a due process violation under the facts of that case.  The Court found the hearsay statements were made under circumstances that provided considerable assurance of their reliability - the third party's confessions were each made spontaneously to a close acquaintance shortly after the murder occurred, each confession was corroborated by some other evidence, and the confessions were self-incriminatory.  Chambers, 410 U.S. at

---

particulars of it, including the name and address of
the declarant, sufficiently in advance of the trial or
hearing to provide the adverse party with a fair
opportunity to prepare to meet it. If, under the
circumstances of a particular case, giving of this
notice was not practicable or failure to give notice is
found by the court to have been excusable, the court
may authorize a delayed notice to be given, and in that
event the opposing party is entitled to a recess,
continuance, or other appropriate relief sufficient to
enable him to prepare to meet the evidence."

300-301, 93 S.Ct. at 1048-1049.   The Supreme Court stated in

_Chambers_,

> "In the exercise of this right [to present witnesses in
> his own defense], the accused, as is required of the
> State, must comply with established rules of procedure
> and evidence designed to assure both fairness and
> reliability in the ascertainment of guilt and innocence.
> Although perhaps no rule of evidence has been more
> respected or more frequently applied in jury trials than
> that applicable to the exclusion of hearsay, exceptions
> tailored to allow the introduction of evidence which in
> fact is likely to be trustworthy have long existed.
> Where constitutional rights directly affecting the
> ascertainment of guilt are implicated, the hearsay rule
> may not be applied mechanically to defeat the ends of
> justice.   Exclusion of such critical evidence may deny a
> defendant a trial in accord with traditional and
> fundamental standards of due process."

See also, _State v. Van Winkle_, 94-0947 (La. 6/30/95), 658 So.2d 198

(evidentiary rules may not supersede the fundamental right to

present a defense); La. Const. art 1, § 16 (a criminal defendant

has the constitutional right to present a defense).

The Fifth Circuit has stated that the holding in _Chambers_ is

fact-intensive and, thus, stands for the limited proposition that

certain egregious evidentiary errors may be redressed by the due

process clause.   _Little v. Johnson_, 162 F.3d 855, 860 (5th Cir.

1998), cert. den., 526 U.S. 1118, 119 S.Ct. 1768 (1999), and cases

cited therein.   See also, _Montana v. Egelhoff_, 518 U.S. 37, 52, 116

S.Ct. 2013, 2022 (1996) ("_Chambers_ was an exercise in highly case-

specific error correction"); _Castillo v. Johnson_, 141 F.3d 218, 222

(5th Cir.), cert. den., 524 U.S. 979, 119 S.Ct. 28 (1998).

According to the Fifth Circuit, the decision in Chambers turns on the existence of a confession that bears "persuasive assurances of trustworthiness."   Little, 162 F.3d at 860, citing Chambers, 410 U.S. at 297-98, 301-02, 93 S.Ct. at 1047, 1049.

In Montana v. Egelhoff, supra, the Supreme Court discussed Chambers, pointing out that the holding in Chambers did not rest on a theory that all competent, reliable evidence must be admitted, but on the ground that the state court's sole rationale for the exclusion of the evidence was wrong and, under the facts and circumstances of that case, the ruling of the trial court deprived Chambers of a fair trial.   In the absence of any valid state justification, exclusion of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive meaningful adversarial testing.   Montana, 518 U.S. at 53, 116 S.Ct. at 2022, quoting Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142 (1986).   Thus, the introduction of relevant evidence can be limited by the State for a valid reason.   Montana, 518 U.S. at 53, 116 S.Ct. at 2022.

In the case at bar, the state courts failed to provide a valid reason for excluding the witness statements which supported McCullough's defense of innocence.   The trial judge denied McCullough's motion, stating,

> "But I don't think we can attribute the - fault to the
> State, us, with having them take the Fifth Amendment.   I
> think it would be unfair to the State to have the

> statements admitted and not subject to any cross
> examination or - or the jury have any - confront the -
> uh, the witnesses."

After McCullough's counsel pointed out the State had used the same
statements to obtain indictments, the Court simply reiterated his
denial of the motion in limine,[7] without making any inquiry into
whether the witnesses were correctly asserting the privilege, and
the circumstances in which the statements were made in order to
determine their admissibility under Article 804(B) or their
trustworthiness (Tr. pp. 1511-1512). McCullough made a proffer to
show his witnesses' unavailability by placing each of his potential
witnesses on the stand, where they each asserted the Fifth
Amendment privilege against self-incrimination, and then proffered
their police statements (Tr. pp. 1513-1526, 225-293).

(c) McCullough's Proffered Evidence

Frederick Gradley (Tr. pp. 267-272) gave a recorded confession
to the crime in December 1994, under oath and after having been
advised of and waiving his rights.[8]   Gradley admitted to his

---

[7] The trial judge's rationale, that the state would not have
the opportunity to cross-examine the witnesses, would always
exclude all hearsay and thus is contrary to the purpose of the
hearsay exception for out-of-court statements made by unavailable
declarants, and failed to recognize and apply clearly established
Supreme Court precedent.

[8] La. C.E. art. 804(B)(3) defines a statement against
interest as:
> "A statement which was at the time of its making was so
> far contrary to the declarant's pecuniary or
> proprietary interest, or so far tended to subject him

participation in the murder and, providing the details, stated that Cedric Howard, Joseph General, Jerry Joseph, Joe Green, and Fredrick Bush had also participated in the crime (Tr. p. 268). Gradley's statement was considered reliable enough to issue arrest warrants for Howard, General, Green, and Bush. See State v. Howard, 1998-0064 (La. 4/23/99), 751 So.2d 783, 790. Moreover, Gradley's confession was considered reliable enough to be admitted against him at his own trial, at which he was convicted of first degree murder and sentenced to the death penalty. State v. Gradley, 1997-0641 (La. 5/19/98), 745 So.2d 1160, 1165-66. Gradley had already been convicted and sentenced by the time McCullough's trial was held. McCullough, 774 So.2d 1105, 1121 n.7.

Cedric Howard (Tr. pp. 259-263) stated to the police that he, Gradley, Simmons, Green, and Joseph were together, prior to the offense, when Gradley began talking to them about his idea to kill the victim and steal her car (Tr. p. 260);[9] Howard stated that both he and Simmons said they did not like the idea (Tr. p. 260-2610,

---

to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

[9] Howard's statement presented inculpatory hearsay statements by Joseph and General. Therefore, Howard's statement was double hearsay, and it's admissibility should have been analyzed under La. Code of Evid. article 805.

and later he and Gradley walked home together because they were neighbors (Tr. p. 261). Howard stated that, the next day, after school, he heard the victim had been killed (Tr. p. 262).

In November 1994, Bush stated to the police that Jerry Joseph and Joseph General admitted to him they had killed the victim for her money (Tr. pp. 290-291); Bush then picked them both out of a photo lineup (Tr. pp. 291-292). In May 1995, Bush made a second statement to the police, under oath (Tr. p. 276), that Joseph General and Jerry Joseph told him they had killed the victim for her money and described how they had done it (Tr. pp. 277-279). Bush further stated that Joe Green told him General and Jerry Joseph were trying to implicate others in the crime because the police kept questioning them about it. Bush said that Jerry Joseph's wife, Melissa Bush, and Daveon McCullough (Bush's younger brother) were also present when General and Jerry Joseph admitted they had committed the crime (Tr. pp. 280-281). General and Jerry Joseph also said if they "went down" for the crime, they were going to take other, innocent people down with them (Tr. p. 283). Bush stated they had all been drinking when this conversation took place (Tr. pp. 284-285). Bush said that Jerry Joseph and Joseph General had both sent messages to Bush that they were going to kill him when they got out of jail (Tr. pp. 287-289). Bush was clearly

disclosing General's and Joseph's inculpatory statements.[10]  One of the prosecutors was present and questioned Bush during Bush's 1995 statement (Tr. p. 284).

The statements were not made by the declarants in an attempt to exculpate McCullough; rather, Gradley and Howard never mentioned McCullough, and Bush did so only to mention his presence at a conversation after the offense had been committed.  Gradley's statement was an incriminating confession as to his participation in the offense and the identity of the other participants, and clearly met the "statement against interest" exception to the hearsay rule set forth in La.C.E. article 804; this error, in conjunction with the other evidentiary errors at trial, rose to a constitutional level by denying McCullough's rights to present a defense and to a fundamentally fair trial.

Further, all three of the statements, by Gradley, Bush, and Howard, met the Chambers exception for presentation of the defense that another person committed the crime.  Bush's and Howard's statements were apparently intended to exculpate themselves and inform the police as to the inculpatory statements made to them by Joseph, and General; the statements made by Joseph and General to Bush and Howard had indicia of reliability because they were made

_____

[10] Bush's statement also presented inculpatory hearsay statements by Joseph and General.  Therefore, Bush's statement, like Howard's, was double hearsay and it's admissibility should have been analyzed under La. Code of Evid. article 805.

spontaneously to a close acquaintance shortly after the murder occurred, were corroborated by other evidence, and were self-incriminatory.

Therefore, Gradley's, Bush's, and Howard's statements supported McCullough's defense of innocence because they tended to show he was not present and did not participate in the offense, directly rebutting the testimony provided by the State's witnesses, Joseph, who testified at McCullough's trial pursuant to his plea bargain with the State, and Wansley, McCullough's one-time cell mate, who testified that McCullough (like another of Wansley's previous cell mates) had supposedly admitted to him that he had participated in the crime.[11]  The refusal to admit these statements, in clear violation of the law as set forth by the Supreme Court in Chambers and Montana v. Egelhoff (exclusion of evidence without a valid justification) resulted in violations of McCullough's constitutional rights both to present his defense and to a fundamentally fair trial.

Moreover, Gradley's statement was an incriminating confession as to his participation in the offense and the identity of the

_____

[11] McCullough's attorney argued that it was doubtful that two black inmates (McCullough and another inmate in an unrelated case) would have individually confided in and confessed to Wansley (a white inmate) that they had committed murders, after knowing Wansley less than one week.  McCullough testified he believed Wansley had learned of the Rabalais murder case by finding and reading McCullough's legal documents, which McCullough had kept in the cell he shared with Wansley.

other participants, and clearly met the "statement against interest" exception to the hearsay rule set forth in La.C.E. article 804. This error, in conjunction with the other evidentiary errors at trial, rose to a constitutional level by denying McCullough's rights to present a defense and to a fundamentally fair trial.

Since the statements were intended to support McCullough's claim that he was not involved in the offense, and McCullough did not have any other witnesses who could testify as to that fact,[12] the statements were obviously crucial to his defense. The circumstances of this case as to this issue resemble those in Chambers, in which the trial judge excluded the testimony of witnesses to whom a third person had confessed to having committed the crime, thereby interfering with Chambers' right to present his defense that someone other than himself had committed the murder. The Supreme Court held that, "in these circumstance, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Chambers, 410 U.S. at 302, 93 S.Ct. at 1049.

---

[12] McCullough's witnesses were medical personnel who testified as to the medical records and reports, and Jerry Joseph's family members who testified as to calls they received from Jerry Joseph after his arrest. None of the defense witnesses were able to testify as to McCullough's activities at the time of the offense.

(d) Trial Errors

The trial judge in the case at bar erred in finding the statements were not admissible into evidence because the prosecutor would not have an opportunity to cross-examine the witnesses; that rationale defeats any hearsay exception.  It is not a valid reason for excluding the hearsay statements.  As stated above, in the absence of any valid state justification, exclusion of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive meaningful adversarial testing.  Montana v. Egelhoff, 518 U.S. at 53, 116 S.Ct. at 2022, quoting Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142 (1986).

The trial judge further erred in failing to question the witnesses' assertion of the privilege against self-incrimination in order to determine whether the witnesses had correctly asserted the privilege.  Finally, the trial judge erred by failing to inquire and consider whether there was any indicia that the hearsay statements were reliable and trustworthy or, in the case of Gradley, met an exception under Article 804, which could rise to a constitutional level.  The state Court of Appeals held the statements were properly excluded because they were not *shown* to be reliable and trustworthy.  However, since the trial judge excluded the statements without making the appropriate inquiries, McCullough was deprived of an opportunity to show the statements were reliable and trustworthy.  In concluding McCullough had not shown the

32

statements were reliable and trustworthy, the Court of Appeals failed to consider the reason the record was devoid of such a showing, i.e., the trial judge's error.

It is noted that Gradley's confession was considered sufficiently reliable to justify issuing arrest warrants for Howard, Joseph, Green, and General, all of whom stand convicted of the crime, and was held to be admissible at Gradley's trial. Bush's and Howard's statements, while not confessions, had some indicia of reliability due to the fact that they were not trying to exculpate McCullough - they did not even mention McCullough. Their statements could have been admitted as statements against interest made by Joseph and Green to Bush and Howard - confessions by Joseph and Green to third parties (Bush and Howard) could have been admissible under Chambers and Montana, which held the exclusion of the testimony of witnesses to whom a third person confessed to having committed the crime interfered with the defendant's right to present his defense that someone other than himself had committed the crime. In contrast, Jerry Joseph's statement to the police, implicating (without proof) McCullough and others who were not named as participants in the murder by Gradley, was made seven months after the murder, after he was arrested and charged with the murder (on the basis of Gradley's confession), after he had reached a plea agreement, and after he had threatened to take other people "down with him" if he was arrested (Tr. p. 283).

33

Since the trial judge did not make the appropriate inquiries into the circumstances justifying the assertion of the privilege against self-incrimination and the reliability of the proffered witness statements, as required under <u>Ohio</u>, <u>Hoffman</u>, and <u>Grunewald</u>, it is impossible for this court to determine whether the exclusion of the statements of Bush and Howard was appropriate; what is clear is that they were not excluded for a valid reason and they were excluded in a constitutionally improper manner.

McCullough was the only defense witness left who could testify as to whether he was present and participated in the offense.  The excluded statements were intended to support McCullough's claim of innocence.  Regardless of whether or not the proffered statements would ultimately have been excluded had they been weighed and considered in a procedurally proper manner, the result of the improper proceedings in this case was that McCullough was deprived of his opportunity to present a defense.

(e) Harmless Error Analysis

Next, this court must determine whether the denial of McCullough's right to present a defense was harmless error.  Since the Supreme Court, in <u>Fry</u>, 127 S.Ct. at 2328, used the harmless error analysis applicable to trial errors to evaluate the <u>Chambers</u> error, it appears this type of constitutional error is a trial error rather than a structural defect.  Therefore, the court must determine whether the trial errors in McCullough's case had a

34

"substantial and injurious effect" on the jury's verdict.  See Fry, 127 S.Ct. at 2328.   The Court should treat the error as if it affected the verdict, and the State bears the burden of persuasion as to the harmlessness of the error.[13]  Fry, 127 S.Ct. at 2328.

In the case at bar, the combination of errors by the trial judge, which resulted in the exclusion of the evidence supporting McCullough's defense for invalid reasons, deprived McCullough of an opportunity to present a defense.[14]  Moreover, it is noted that Gradley's statement would have had a substantial effect on the jury's verdict - he confessed under oath to the murder and named the other participants, which did not include McCullough.   In the context of the circumstances of this case, where there was no physical evidence directly linking McCullough to the offense; the only evidence against McCullough was the bargained-for testimony by Jerry Joseph, and the testimony of a jailhouse informant, Wansley.[15]

---

[13] In its brief before this court, the State failed to address McCullough's issue as to the proffered hearsay statements.

[14] Since it is impossible to tell from the record before this court what should have been done with McCullough's proffered statements and witnesses at trial, the court cannot reach the point of determining whether the constitutional error had a substantial and injurious effect on the jury's verdict (for which the State would bear the burden of proof).

[15] According to Wansley, he and McCullough were cell mates for one week, during which McCullough confessed all to Wansley. McCullough testified that he did not know Wansley, his attorneys had instructed him not to talk to anyone about the case, and he did not confide in Wansley; McCullough testified that Wansley learned about the case by reading McCullough's legal papers,

Therefore, the impact of the denial of McCullough's right to present a defense was substantial and injurious. Therefore, the court must conclude that McCullough was denied his constitutional right to a fundamentally fair trial.[16] Compare, <u>Wallace v. Price</u>, 265 F.Supp.2d 545 (W.D.Pa. 2003), aff'd, 2007 WL 1732559 (3rd Cir. 6/18/2007) (affirming district court's decision to vacate first degree murder conviction because the trial court did not admit hearsay evidence of a statement made by defendant's accomplice that he, not defendant, shot the victim; the refusal to admit this statement violated defendant's rights under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment, as set forth in <u>Chambers v. Mississippi</u>).

For these reasons, McCullough's petition for writ of habeas corpus should be granted and his conviction and sentence should be reversed and vacated.

<u>Ground No. 3 - Ineffective Assistance of Counsel</u>

Finally, McCullough claims he had ineffective assistance of counsel at trial because his attorney allowed the use of perjured testimony by Jerry Joseph and failed to object to the withholding

---

which he had kept in the cell. Wansley admitted he had previously testified against other cell mates as to confessions they had purportedly made to him.

[16] This court is not expressing a view as to McCullough's guilt or innocence, but stating only that, because McCullough did not have a fair trial, he is entitled to reversal of his conviction and a new trial.

of favorable evidence by the prosecution.

To establish that his legal representation at trial fell short of the assistance guaranteed by the Sixth Amendment, a convicted defendant must meet the two-pronged test set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He must show that his counsel's performance was both deficient (i.e., that counsel did not provide reasonably effective assistance under prevailing professional norms) and prejudicial (i.e., that errors by counsel "actually had an adverse effect on the defense). The former component of the test authorizes only "highly deferential" judicial scrutiny, requiring the defendant to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. On the latter component, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding; rather, he must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Anderson v. Collins, 18 F.3d 1208, 1215 (5th Cir. 1994), and cases cited therein. Also, Jones v. Cain, 227 F.3d 228, 230 (5th Cir. 2000), and cases cited therein; U.S. v. Segler, 37 F.3d 1131, 1136 (5th Cir. 1994).

McCullough contends his counsel was ineffective for allowing the State to offer perjured testimony by Jerry Joseph. However,

McCullough's counsel moved to suppress Joseph's testimony and his testimony at the preceding trials of co-defendants, and offered Joseph's plea bargain into evidence so the jurors would factor that into their decision as to Joseph's credibility.  McCullough also claims his attorney should not have "allowed" Jerry Joseph to testify.  However, as already stated, McCullough's trial counsel attempted to suppress Joseph's testimony and did what he could to lessen Joseph's credibility with the jury.  McCullough has not alleged any additional course of action his counsel could have taken.

McCullough also claims his attorney should have procured DNA evidence to prove his innocence.  However, as discussed above, the State requested a DNA test, but the lab was not able to obtain sufficient samples from the stained towels to test for DNA.

Finally, McCullough contends briefly that his attorney allowed his due process right to be violated.  As discussed at length above, his attorney did everything he could to present the statements of Bush, Gradley, and Howard.  McCullough also contends vaguely that his attorney failed to effectively "investigate, object, or otherwise perform his duties consistent with the Sixth Amendment."  Since McCullough fails to specify any evidence further investigation would have revealed, or what other objections should have been made or duties should have been performed, this claim is wholly unsupported.

Therefore, McCullough's claim that he had ineffective assistance of counsel at trial is meritless.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that McCullough's petition for writ of habeas corpus be GRANTED and that McCullough be GRANTED a conditional writ of habeas corpus, ordering his discharge from custody unless the State of Louisiana returns him to the Ninth Judicial District Court, Rapides Parish, Louisiana, for re-arraignment within 60 days after the date of this Court's judgment.

Under the provisions of 28 U.S.C. § 636(b)(1)© and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM**

39

ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND

LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this

day of July, 2007.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE